## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

LYDELL SMITH,                )
                           )
    Plaintiff,            )
                           )  Civil Action File No.
                           )  1:22-CV-0277-MHC-JCF
vs.                      )
                           )
THE LOVETT SCHOOL, INC.   )
                           )
    Defendant.       )
                           )
                           ) **JURY TRIAL DEMANDED**
                           )
_____ )

## <u>COMPLAINT</u>

Plaintiff Lydell Smith ("Plaintiff" or "Mr. Smith") hereby asserts his Complaint against the above-captioned Defendant The Lovett School (hereinafter "employer" or "Defendant") and shows the Court as follows:

### NATURE OF ACTION

1.

This cause of action arises under 1) the Americans with Disabilities Act, as amended by the Americans with Disabilities Act Amendments Act ("ADAAA"); 2) the Family and Medical Leave Act of 1993, 29 U.S.C. §§2601 et seq. ("FMLA");

3) Title VII of the Civil Rights Act, as amended ("Title VII"); and 4) 42 U.S.C. § 1981 ("Section 1981").

## JURISDICTION AND VENUE

### 2.

Jurisdiction over the claims in this Complaint is conferred pursuant to U.S.C. §§ 1331 and 1337.

### 3.

Jurisdiction and venue are proper in this judicial district.

## PARTIES

### 4.

Plaintiff Lydell Smith is an adult citizen and is entitled to bring actions of this nature and type. Plaintiff was and is a resident of the State of Georgia and the Northern District of Georgia at all times material to Plaintiff's employment relationship with Defendant.

### 5.

Defendant is a coeducational, kindergarten through twelfth grade independent school located in north Atlanta, Georgia.

6.

Defendant is subject to this Court's jurisdiction and may be properly served with process by delivering a copy of the Summons and Complaint upon its registered agent CT Corporation System, 289 S. Culver St, Lawrenceville, GA, 30046-4805.

7.

At all times relevant to this action, Defendant was a covered employer as defined by the ADAAA, FMLA, Title VII, and Section 1981.

8.

At all times relevant to this action, Defendant was the employer of Plaintiff, as defined by the ADAAA, FMLA, Title VII, and Section 1981.

9.

At all times relevant to this action, Plaintiff was an "employee" of Defendant within the meaning of the ADAAA, FMLA, Title VII and Section 1981.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

10.

Mr. Smith has exhausted all administrative prerequisites prior to filing this action.

11.

Mr. Smith timely filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"), raising his claims for violation of Title VII.  Mr. Smith timely amended his Charge of Discrimination to include claims for violation of the ADAAA.  The EEOC completed its investigation and issued a Notice of Right to Sue.  Mr. Smith brings this action within ninety (90) days of receipt of his Notice of Right to Sue.

**(TITLE VII & SECTION 1981 ALLEGATIONS)**

12.

Mr. Smith was employed by Defendant beginning October 15, 2014 through February 19, 2021.

13.

Mr. Smith was last employed by Defendant as the Director of Auxiliary Programs.

14.

As the Director of Auxiliary Programs, Mr. Smith was responsible for the following departments: Summer Camps, After School Activities Programs,

Afternoon Enrichment Programs, Adult Education Programs, and Aftercare for the Middle and Upper School.

15.

As the Director of Auxiliary Programs, Mr. Smith's job duties included overseeing summer programs, holiday camps, after-school programs, adult education programs, and auxiliary programs.

16.

As the Director of Auxiliary Programs, Mr. Smith was responsible for handling the registration and parent communication for the pilot transportation program, which began in February 2019.

17.

For six (6) years, Mr. Smith worked with the former Director of Summer School, Marc Mallet, to plan and market all aspects of the summer programming.

18.

The departments Mr. Smith managed were all considered revenue generating departments through Defendant's business office, including aftercare, afternoon enrichments, and summer programs.

19.

During his employment, Defendant selected Mr. Smith to not only serve in a director level position, but also as a member of the core leadership team, and as a member of the Advisory Board for the Summer Programs and Auxiliary Revenue Collaborative ("SPARC"), a national board that supports independent schools.

20.

At Defendant's request, Mr. Smith developed and organized a regional collaborative with other independent school leaders whose roles included after-school, afternoon enrichments, summer school, summer camps, transportation, facility rentals, etc.

21.

As the Director of Auxiliary Programs, Defendant gave Mr. Smith significant responsibilities, including, but not limited to, revenue generating responsibilities.

22.

During his employ, Mr. Smith reported to Chief Operating Officer, Gray Kelly (white male) (hereinafter "Mr. Kelly") who served as Mr. Smith's immediate supervisor.

23.

Mr. Kelly had a total of six (6) direct reports, including Plaintiff.

24.

Mr. Kelly's direct reports all held the title of Director and performed Director level job duties.

25.

All of the Directors who reported to Mr. Kelly, performed job duties that were the same or similar to the job duties Mr. Smith performed.

26.

Plaintiff was the only African American male who reported to Mr. Kelly.

27.

With the exception of Plaintiff, Mr. Kelly met with his direct reports on a weekly or bi-weekly basis.

28.

Mr. Smith was the only direct report Mr. Kelly did not have a standing meeting with; in fact, Mr. Kelly never put Mr. Smith on his calendar for meetings.

29.

Between July 2019 and May 2020, Mr. Kelly only met with Mr. Smith four (4) or five (5) times.

30.

Mr. Smith was paid less than the non-black Directors who reported to Mr. Kelly.

31.

On February 5, 2020, Mr. Smith met with Mr. Kelly to discuss his ideas as to how the operation of his departments could be enhanced.

32.

On February 10, 2020, Mr. Smith met with Mr. Kelly for a follow up meeting to further discuss his suggestions for the program, which were intended to improve the operation of the departments for which he was responsible.

33.

Mr. Smith presented Mr. Kelly with a new organizational chart that he created in an effort to better structure the departments that he managed and also to account for the Director of Summer School position since it would become vacant effective July 2020.

34.

During their meeting, Mr. Kelly seemed pleased with Mr. Smith's suggestions and he informed Mr. Smith that he would discuss his ideas over with Meredyth Cole (hereinafter "Ms. Cole"), the Head of School.

35.

On February 14, 2020, Defendant announced a vacant position under the title, Director of Student Services.

36.

Defendant later changed the title of the vacant position from Director of Student Services to Director of Strategic Programs.

37.

When Defendant announced the vacant position on February 14, 2020, Defendant included all of the suggestions Mr. Smith previously recommended to Mr. Kelly during their meeting on February 10, 2020.

38.

In creating the Director of Strategic Programs position, Defendant restructured or absorbed Mr. Smith's duties as the Director of Auxiliary Programs into the Director of Strategic Programs position.

39.

In creating the Director of Strategic Programs position, Defendant largely included job duties Mr. Smith had been performing for years, albeit in his capacity as the Director of Auxiliary Programs.

40.

Defendant's position description for the Director of Strategic Programs closely resembled Mr. Smith's position as the Director of Auxiliary Programs.

41.

The position description for the Director of Strategic Programs was so similar to Mr. Smith's position as the Director of Auxiliary Programs that co-workers who saw the job announcement believed Mr. Smith was planning to resign.

42.

When Mr. Smith spoke with Mr. Kelly about the job announcement for the Director of Strategic Programs position, Mr. Smith asked whether he should apply for the position considering he was already carrying out the same job duties that were required of the position.

43.

Mr. Kelly told Mr. Smith that he should apply for the position because the vacancy was allegedly open to anyone.

44.

On February 18, 2020, Mr. Smith applied for the Director of Strategic Programs position.

45.

Shortly thereafter, Mr. Smith asked to meet with the Director of Human Resources, Mamie Hodnett (hereinafter "Ms. Hodnett"), to discuss the internal hiring process.

46.

When Ms. Hodnett and Mr. Smith met the next day, Ms. Hodnett explained that Mr. Smith would have to go through a screening interview with Human Resources as well as an interview with Mr. Kelly.

47.

Mr. Smith told Ms. Hodnett that the vacant Director of Strategic Programs was very similar to his position as the Director of Auxiliary Programs.

48.

Mr. Smith asked Ms. Hodnett whether the Director of Auxiliary Programs position he held would be reporting to the Director of Strategic Programs.

49.

Ms. Hodnett confirmed to Mr. Smith that the Director of Auxiliary Programs would be reporting to the Director of Strategic Programs.

50.

Before Defendant announced the Director of Strategic Programs position, Mr. Smith only reported to Mr. Kelly and no other Directors who reported to Mr. Kelly were required to report to another Director.

51.

Defendant's decision to require the Director of Auxiliary Programs to report to the Director of Strategic Programs, effectively amounted to a demotion for Mr. Smith because Mr. Smith would be reporting to whoever was selected to fill the vacant position.

52.

On February 28, 2020, Mr. Smith interviewed with the Head of School, Ms. Cole (white female), for the Director of Strategic Programs position.

53.

During his interview, Mr. Smith elaborated on a previous conversation he had with Ms. Cole where she asked Mr. Smith to share his thoughts and concerns specifically, as a "Black male in leadership at Lovett."

54.

Mr. Smith told Ms. Cole that as an African American male, he felt that he was continuously having to prove himself and work twice as hard for validation as a leader compared to his white counterparts.

55.

To demonstrate his point to Ms. Cole, Mr. Smith discussed the fact that he was required to interview and compete for the Director of Strategic Programs position.

56.

Mr. Smith told Ms. Cole that from his perspective, the fact that Defendant required him to interview for the Director of Strategic Programs position confirmed for him that he was perceived differently by Defendant and had to work twice as hard as his peers to prove himself as an African American male.

57.

During his interview, Mr. Smith also told Ms. Cole that he believed the reason Defendant required him to interview and compete for the Director of Strategic Programs position was solely because he is an African American male.

58.

After sharing his frustration about what he believed to be racism and racist personnel practices by Defendant, Ms. Cole apologized stating she was "sorry [Mr. Smith] felt that way."

59.

After sharing his frustration about what he believed to be racism and racist personnel practices by Defendant, Ms. Cole quickly ended the interview.

60.

Ms. Cole did not escalate Mr. Smith's complaint of gender and race discrimination further.

61.

Defendant did not conduct an investigation into the complaint of race and gender discrimination Mr. Smith raised on February 28, 2020.

62.

In or around June 2020, Ms. Cole began publicly recognizing Mr. Gilbreath for his work but would not publicly acknowledge Mr. Smith or his team for their work.

63.

On June 2, 2020, in an email to Mr. Kelly, Mr. Smith reiterated the complaints of race and gender discrimination he initially raised with Ms. Cole months prior.

64.

Similar to his discussion with Ms. Cole, Mr. Smith shared with Mr. Kelly his frustrations with being only one (1) of two (2) African American males in leadership and how challenging it had been attending virtual faculty/staff meetings and reading emails where Ms. Cole only recognized Mr. Gilbreath's work and never acknowledged Mr. Smith's work or that of his team.

65.

In response to his complaint of race-based disparate treatment, Mr. Kelly told Mr. Smith to "keep it coming" but he did not escalate Mr. Smith's complaints of discrimination further.

66.

Defendant did not conduct an investigation into the complaint of race and gender discrimination Mr. Smith made on June 2, 2020.

67.

Mr. Smith's complaints of discrimination were not the first time an African American employee complained of racism, race-based disparate treatment, or race-based personnel practices by Defendant.

68.

On April 2, 2020, Mr. Smith learned that a white male, Ted Gilbreath ("Mr. Gilbreath"), was selected for the Director of Strategic Programs position.

69.

At the time of his selection, Defendant employed Mr. Gilbreath as the Interim Athletic Director.

70.

Mr. Gilbreath did not apply for the Director of Strategic Programs position.

71.

The only time Mr. Gilbreath applied for a position with Defendant was in November 2019, when he applied to become the permanent Athletic Director.

72.

Defendant hired Mr. Gilbreath as the Interim Athletic Director but declined to hire him on a permanent basis even though Mr. Gilbreath worked as an Athletic Director with his previous employer.

73.

After hiring Mr. Gilbreath on an interim basis, Defendant paid for and hired an external search firm to assist Mr. Gilbreath with finding a permanent position.

74.

The external search firm was not successful in finding a new position for Mr. Gilbreath.

75.

When the external search firm was unsuccessful, Mr. Kelly pre-selected Mr. Gilbreath to fill the Director of Strategic Program position without requiring him to compete against other qualified applicants.

76.

Mr. Gilbreath began serving as the Director of Strategic Programs in May 2020.

77.

Defendant never interviewed Mr. Gilbreath for the Director of Strategic Programs position.

78.

Mr. Kelly recorded all scheduled interviews on his Google Calendar.

79.

Mr. Kelly and Mr. Smith shared access to each other's Google Calendar.

80.

Mr. Kelly's Google Calendar never reflected any meetings or calendar entries suggesting Mr. Gilbreath was ever scheduled to interview for the Director of Strategic Programs position.

81.

Defendant's Human Resources personnel, LaShonda James ("Ms. James"), had access to Mr. Kelly's Google Calendar.

82.

Ms. James told Mr. Smith there was no record within Defendant's hiring and recruitment database showing Mr. Gilbreath had ever applied for the Director of Strategic Programs position.

83.

Ms. James told Mr. Smith there was no record within Defendant's hiring and recruitment database indicating Mr. Gilbreath ever interviewed for the Director of Strategic Programs position.

84.

Mr. Kelly told Mr. Smith that Mr. Gilbreath was selected for the position because he had classroom, or rather, teaching experience and he could help to enhance the summer school program.

85.

On September 29, 2020, Mr. Smith filed a Charge of Discrimination ("Charge") with the U.S. Equal Employment Opportunity Commission ("EEOC") against Defendant and on March 3, 2021, Mr. Smith amended his Charge.

86.

During the EEOC's investigation, Defendant asserted Mr. Gilbreath was selected over Mr. Smith because Mr. Gilbreath had teaching experience and Mr. Smith did not.

87.

At the time of Defendant's selection decision, Mr. Smith had prior teaching experience, of which Defendant was aware.

88.

At the time of the selection decision, Mr. Smith had previously taught curriculum to middle school students for five (5) years while under Defendant's employ.

89.

Additionally, Mr. Smith also had five (5) years of teaching experience prior to being hired by Defendant.

90.

At all times relevant to this action, Defendant was aware of Mr. Smith's past teaching experience.

91.

During a previous conversation with Mr. Smith, Mr. Kelly acknowledged that Mr. Smith met all of the requirements for the Director of Strategic Programs position.

92.

In addition to his past teaching experience, Mr. Smith held high-level leadership positions for over a decade including, but not limited to, a director level role for other non-profit organizations and a director level role with Defendant as its Director of Auxiliary Programs.  Further, since 2018, Mr. Smith served on the Advisory Board for the Summer Programs and Auxiliary Revenue Collaborative ("SPARC"), a national organization that offers programming and revenue management for independent schools like Defendant.

93.

While Mr. Smith held a permanent Director position with Defendant for several years, Mr. Gilbreath had only served as Defendant's Athletic Director on an

interim basis for a few months before Defendant placed him in the Director of Strategic Programs position.

94.

Other than having served as Defendant's Interim Athletic Director for a few months, Mr. Gilbreath's past leadership experience was limited to his experience as a director at another school.

95.

Compared to Mr. Gilbreath, Mr. Smith held significantly more prominent administrative positions during and prior to his employment with Defendant.

96.

At the time of the selection decision, Defendant was aware of Mr. Smith's past experience working as a Director for a previous employer.

97.

At the time of the selection decision, Defendant was aware of the past leadership and administrative positions Mr. Smith held while employed by Defendant.

98.

In November 2019, Defendant selected Mr. Smith to participate in the sub-committee of the Strategic Planning: Lovett Programs.

99.

Defendant did not select Mr. Gilbreath to participate in the sub-committee of the Strategic Planning: Lovett Programs; Defendant did not seek Mr. Gilbreath's input at all.

100.

Unlike Mr. Smith, Mr. Gilbreath did not have experience as a member of Defendant's core leadership team, nor did he hold positions with SPARC.

101.

At the time of the selection decision, Mr. Smith had five (5) years of experience working alongside Defendant's former Director of Summer School, Marc Mallet ("Mr. Mallet").

102.

While working alongside Mr. Mallet, Mr. Smith gained experience planning and marketing all aspects of Defendant's summer programming.

103.

At the time of the selection decision, Mr. Gilbreath did not have any experience planning and marketing all aspects of Defendant's summer programming.

104.

Throughout his tenure with Defendant, Mr. Smith successfully developed relationships with the very external organizations the Director of Strategic Programs would be expected to partner with on a routine basis.

105.

At the time of the selection decision, Mr. Gilbreath did not have any relationships with the external organizations the Director of Strategic Programs was expected to partner with on a routine basis.

106.

Defendant asserts Mr. Gilbreath was more qualified for the Director of Strategic Programs position than Mr. Smith because Mr. Gilbreath held a Master's Degree in Fine Arts.

107.

A Master's Degree in Fine Arts was not related to the job duties of the Director of Strategic Programs.

108.

Because Mr. Smith's duties as the Director of Auxiliary Programs were absorbed into the Director of Strategic Programs position, Mr. Smith had at least six (6) years of experience performing the same job duties he would have been required to perform had he been selected to fill the Director of Strategic Programs position.

109.

Because Mr. Smith's duties as the Director of Auxiliary Programs were absorbed into the Director of Strategic Programs position, Mr. Gilbreath's experience was not comparable to that of Mr. Smith.

110.

Mr. Smith was far more significantly qualified for the Director of Strategic Programs position compared to Mr. Gilbreath.

111.

Months after being selected for the Director of Strategic Programs position, Mr. Gilbreath acknowledged to Mr. Smith that he could "really benefit from [Mr. Smith's] experience."

112.

Mr. Gilbreath himself recognized that Mr. Smith's experience far outweighed his own.

**(ADAAA ALLEGATIONS)**

113.

As the Director of Auxiliary Programs, Mr. Smith's job duties were routinely administrative in nature.

114.

Mr. Smith's position entailed tasks such as student registration, parent calls, communications with School partners, and email correspondence.

115.

Mr. Smith's position did not require face-to-face interaction with students, faculty, staff members, vendors, or parents.

116.

As the Director of Auxiliary Programs, Mr. Smith's job duties and responsibilities could be fully performed remotely.

117.

There was nothing in Mr. Smith's position description that required him to work in the office.

118.

On March 18, 2020, Defendant temporarily closed due to the pandemic.

119.

On March 23, 2020, Defendant reopened and resumed classes by offering virtual learning for students.

120.

As of March 23, 2020, Defendant began allowing faculty and staff to work remotely, including Mr. Smith.

121.

On March 23, 2020, Mr. Smith began working from home along with other faculty and staff due to the pandemic.

122.

On July 6, 2020, Mr. Smith tested positive for COVID-19.

123.

The side effects of Mr. Smith's COVID-19 diagnosis substantially limited his respiratory system and special sense organs (for smell and taste), among other major bodily functions and major life activities.

124.

Mr. Smith experienced other COVID-19 side-effects, including but not limited to, difficulty thinking or concentrating (i.e. brain fog), fatigue, loss of taste and smell, inability to interact with others, and joint inflammation.

125.

The side effects of Mr. Smith's COVID-19 diagnosis lingered for an extended period of time, or rather over six (6) months, such that he is considered a COVID-19 "long-hauler" or someone who experienced "long COVID."

126.

Because Mr. Smith was contagious following his diagnosis, his only medical restriction was to avoid contact with others while his symptoms persisted.

127.

On or around August 7, 2020, Mr. Smith discussed his medical condition and COVID-19 diagnosis with Mr. Kelly and Mr. Gilbreath.

128.

On August 7, 2020, Mr. Smith sent a follow up email, which included a doctor's note informing Defendant that Mr. Smith was experiencing a "COVID-like respiratory illness with residual symptoms and protracted recovery."

129.

In his email, Mr. Smith informed Defendant that he was happy to continue working from home.

130.

Defendant never responded to Mr. Smith's email so Mr. Smith continued working from home for several weeks after he began experiencing symptoms of COVID-19.

131.

While working from home, Mr. Smith attended meetings virtually and successfully performed his job duties remotely.

132.

Mr. Smith successfully worked from home for a total of six (6) months beginning March 23, 2020 and ending on September 8, 2020.

133.

On or around September 2, 2020, Mr. Smith had a call with Mr. Kelly, during which time Mr. Smith explained that he was still experiencing COVID-19 symptoms, including but not limited to, the loss of his ability to smell and taste, chronic fatigue, and respiratory problems.

134.

During their phone call, Mr. Smith told Mr. Kelly that he was interested in continuing his work from home arrangement because of his medical condition and his medical restriction to avoid contact with others.

135.

Mr. Kelly denied Mr. Smith's request to continue working from home and rescinded his existing work from home arrangement.

136.

Instead of allowing Mr. Smith to continue working remotely, Mr. Kelly instructed Mr. Smith to take a leave of absence under the Family Medical Leave Act ("FMLA").

137.

Mr. Smith did not desire to take FMLA leave.

138.

However, Mr. Kelly told Mr. Smith his only option was to take FMLA leave.

139.

Mr. Kelly explained to Mr. Smith that his only option was to take FMLA leave because as a matter of policy, all employees who were impacted by COVID-19 were required to take FMLA leave.

140.

At the time of Mr. Smith's request to continue working from home, Defendant had a Reasonable Accommodations policy in place that applied to all employees.

141.

At all times relevant to this action, Mr. Kelly was aware of Defendant's Reasonable Accommodations policy.

142.

Defendant's Reasonable Accommodations policy states, "[t]he School will not require any employee to accept an accommodation the employee chooses not to accept or that is unnecessary to performing the essential functions of their job."

143.

Mr. Kelly's decision to force Mr. Smith to take FMLA leave as an accommodation against his wishes, violated Defendant's Reasonable Accommodations policy.

144.

Mr. Kelly's decision to force Mr. Smith to take FMLA leave, although FMLA leave was not necessary, violated Defendant's Reasonable Accommodations policy.

145.

Defendant's Reasonable Accommodations policy further states, "the School will not require any employee to take leave if another reasonable accommodation is available."

146.

Mr. Kelly's decision to force Mr. Smith to take leave when an effective reasonable accommodation existed that would allow him to perform the essential functions of his job, violated Defendant's Reasonable Accommodations policy.

147.

As a result of Mr. Kelly's decision to deny Mr. Smith's request to continue working from home and instruction to take FMLA leave, Mr. Smith felt compelled to apply for FMLA leave as that was the only option Defendant offered.

148.

At all times relevant to this action, Mr. Smith was capable of working from home.

149.

At the time of denying Mr. Smith's request, Mr. Kelly knew Mr. Smith was capable of working from home, was already doing so, and had been doing so successfully for six (6) months.

150.

When Mr. Smith's medical leave expired in February 2021, Defendant did not allow Mr. Smith to resume working from home.

151.

Defendant never allowed Mr. Smith to resume working from home at any point between the date of his initial request in September 2020 and February 2021.

152.

Defendant would only allow Mr. Smith to resume working if he obtained a doctor's note fully releasing him to return to work in person.

153.

Instead of providing an accommodation that would have allowed Mr. Smith to continue working and maintain his employment, Defendant terminated Mr. Smith's employment in February 2021.

154.

Working remotely as an accommodation would have allowed Mr. Smith to continue performing the essential functions of his position and in turn, maintain his employment.

**(FMLA & ADAAA ALLEGATIONS)**

155.

On or around September 8, 2020, Mr. Smith applied for FMLA leave at Mr. Kelly's instruction.

156.

The FMLA forms Defendant received on Ms. Smith's behalf noted, "Mr. Smith is not to come in contact with anyone while his symptoms persist […] no contact with anyone during illness with residual symptoms and protracted recovery."

157.

Mr. Smith applied for and was approved for a twelve (12) week medical leave of absence under the FMLA which covered the period from September 8, 2020 through and including December 4, 2020.

158.

On or around August 6, 2020, Mr. Smith submitted a doctor's note to Defendant advising of the following diagnosis: "recent COVID-like respiratory illness with residual symptoms and protracted recovery."

159.

Defendant required Mr. Smith to work during his approved FMLA leave.

160.

Specifically, on September 21, 2020, Mr. Smith hosted a work-related virtual meeting at Mr. Gilbreath's request.

161.

Out of a desire to keep his job, Mr. Smith felt compelled to host the virtual meeting, even though he was on approved FMLA leave at the time.

162.

While Mr. Smith was on approved FMLA leave, Mr. Gilbreath also repeatedly contacted him to ask questions about programs, vendors, and to request files, etc.

163.

Out of a desire to keep his job, Mr. Smith felt compelled to respond to the various emails and text messages he received from Mr. Gilbreath during his approved FMLA leave period.

164.

On or around October 6, 2020, Mr. Smith submitted a doctor's note to Defendant stating that he continued to test positive for COVID-19.

165.

On October 28, 2020, Defendant sent Mr. Smith a return to work form for his doctor's completion.

166.

On October 28, 2020, Defendant told Mr. Smith he could only resume working if he provided a doctor's note "releasing [him] to come back to work."

167.

On or around November 6, 2020, Mr. Smith submitted another doctor's note to Defendant stating that he continued to test positive for COVID-19.

168.

On or around November 9, 2020, Defendant told Mr. Smith to ask his doctor if he could be released to return to work on December 7, 2020.

169.

At the time of Defendant's request for a full medical release on November 9, 2020, Defendant knew Mr. Smith remained contagious and continued to test positive for COVID-19.

170.

On November 9, 2020, Mr. Smith told Defendant that his doctor did not believe it would be in the best interest of his health to return to work in person.

171.

On December 4, 2020, Mr. Smith's FMLA leave expired.

172.

When his FMLA leave expired, Mr. Smith still had a medical restriction to avoid contact with others due to possible contagion.

173.

Mr. Smith remained capable of working remotely when his FMLA leave expired but Defendant did not reinstate Mr. Smith to his position.

174.

When his FMLA leave expired, Defendant did not revisit the possibility of Mr. Smith working remotely, nor did it reconsider its earlier decision to deny Mr. Smith's request to continue working from home.

175.

Since Defendant had previously denied his request to work remotely and asked him to obtain a medical release fully clearing him to work in-person, Mr. Smith had no choice but to request additional leave when his FMLA leave expired.

176.

When his FMLA leave expired, Mr. Smith requested and was approved additional medical leave from December 5, 2020 to February 15, 2021.

177.

In an email dated, January 6, 2021, Ms. Lambert told Mr. Smith to "make sure to follow up with [his] doctor, prior to the release date of February 15, 2021 to receive the return to work form;" however, Ms. Lambert never told Mr. Smith that failure to follow up with her by the stated deadline would result in his immediate dismissal.

178.

Although Ms. Lambert normally sent Mr. Smith a fitness for duty form prior to the end of his approved leave period, she did not do so prior to February 15, 2021.

179.

On February 19, 2021, Defendant terminated Mr. Smith's employment.

180.

Defendant never notified Mr. Smith that he would lose his job if he failed to return to work by a certain date.

181.

As of the date of his discharge, Mr. Smith remained capable of working remotely.

182.

Defendant states that it terminated Mr. Smith's employment because he exhausted his leave and could not resume working in person.

183.

At the time of terminating Mr. Smith's employment, Defendant knew Mr. Smith was still experiencing symptoms of COVID-19.

184.

At the time of terminating Mr. Smith's employment, Defendant knew Mr. Smith remained contagious and needed to avoid in person contact with others.

185.

At the time of terminating Mr. Smith's employment, Defendant knew Mr. Smith had not been medically cleared to resume working in person.

186.

Defendant never reconsidered Mr. Smith's earlier requests to work from home prior to terminating his employment.

187.

Prior to terminating his employment, Defendant did not discuss with Mr. Smith or his medical provider, the possibility of Mr. Smith working from home.

188.

Allowing Mr. Smith to work from home, would not have caused Defendant to suffer undue hardship.

189.

Prior to terminating his employment, Defendant did not discuss with Mr. Smith or his medical provider, the possibility of granting Mr. Smith four (4) weeks of additional leave.

190.

Allowing Mr. Smith to take four (4) additional weeks off when his medical leave expired in February 2021, would not have caused Defendant to suffer undue hardship.

191.

Prior to terminating his employment, Defendant did not discuss with Mr. Smith or his medical provider, any alternative accommodations that would have allowed Mr. Smith to remain employed.

192.

On February 22, 2021, Mr. Smith attempted to engage in the interactive process with Defendant by emailing Ms. Lambert, among others, advising of the miscommunication concerning his doctor's note and he forwarded his doctor's note advising of his need for additional leave through March 15, 2021.

193.

At the time of informing Defendant that he had not been released to return to work in person, Mr. Smith reminded Defendant of the possibility of a work from home arrangement as an accommodation.

194.

In response, Defendant did not engage in the interactive process.

195.

On February 24, 2021, Mr. Smith sent a follow up email to Defendant inquiring about the status of his request for further accommodation in the form of resuming his earlier work from home arrangement or additional leave.

196.

Defendant did not engage in the interactive process with Plaintiff.

197.

Instead, Defendant declined to consider Mr. Smith's medical documentation and his requests for accommodation, stating his termination had already been processed.

## **CLAIMS FOR RELIEF**

## **COUNT ONE: FAILURE TO ACCOMMODATE IN VIOLATION OF THE ADAAA**

The allegations in the preceding paragraphs are incorporated by reference as if set forth herein.

198.

Defendant is an employer as defined by the ADAAA and was Plaintiff's employer as defined therein.

199.

At all times relevant to this action, Plaintiff suffered from an actual disability as defined under the ADAAA.

200.

At all times relevant to this action, Plaintiff was a "qualified individual" as that term is defined by the ADAAA.

201.

Plaintiff requested a reasonable accommodation for his disability. One of Plaintiff's requests was to continue working from home. Another of Plaintiff's accommodation requests was to resume working from home. Plaintiff also requested a reasonable accommodation when his extended medical leave expired and he requested a leave extension.

202.

Defendant denied Plaintiff's requested accommodation to extend his medical leave by an additional four (4) weeks.

203.

Defendant also denied Plaintiff's requested accommodation to continue or resume working from home.

204.

In denying Plaintiff's requested accommodation, Defendant failed to conduct an individualized assessment of Mr. Smith's ability to perform the essential functions of his position.

205.

At all times relevant to this action, Defendant and individuals involved in the decision to deny Plaintiff's requested accommodation had actual knowledge of Plaintiff's disability.

206.

At all times relevant to this action, Defendant and individuals involved in the decision to terminate Plaintiff had actual knowledge of Plaintiff's disability and his requested accommodation.

207.

At all times relevant to this action, Defendant and individuals involved in the decision to terminate Plaintiff had actual knowledge of Plaintiff's requested accommodation.

208.

At all times relevant to this action, Plaintiff was capable of performing the essential functions of his position with an accommodation.

209.

An effective reasonable accommodation existed that would have enabled Mr. Smith to perform the essential functions of his job.

210.

An effective reasonable accommodation existed that would have enabled Mr. Smith to remain employed.

211.

Defendant refused to provide Plaintiff with an effective reasonable accommodation, even though to do so would not impose an undue hardship.

212.

Defendant also terminated Plaintiff's employment in lieu of providing an effective reasonable accommodation.

213.

By refusing to reasonably and effectively accommodate Plaintiff, Defendant knowingly and intentionally violated the ADAAA.

214.

As a direct and proximate result of Defendant's unlawful actions and failures to act, Plaintiff has suffered compensatory damages including, emotional distress,

mental anguish, physical harms, and other non-pecuniary losses, as well as economic damages, for which he is entitled to recover from Defendant.

215.

Defendant performed the above actions willfully, wantonly, intentionally, with malice and/or in reckless disregard of Plaintiff's federally-protected rights. Plaintiff is therefore entitled to punitive damages.

216.

All conditions precedent to bringing this Count have been completed, performed, and/or waived.

## COUNT TWO: RETALIATION IN VIOLATION OF THE ADAAA (RESCISSION OF WORK FROM HOME ARRANGEMENT & FORCING PLAINTIFF TO TAKE & EXHAUST FMLA LEAVE)

The allegations in the preceding paragraphs are incorporated by reference as if set forth herein.

217.

At all times relevant to this action, Plaintiff has been an individual with a disability as defined by the ADAAA.

218.

At all times relevant to this action, Defendant "regarded" Plaintiff as having a disability such that he is a person with a disability and/or perceived disability within the meaning of the ADAAA.

219.

Plaintiff engaged in protected activity by requesting an accommodation because of his actual or perceived disability.

220.

Defendant retaliated against Plaintiff on the basis of his protected activity by rescinding his work from home arrangement and in turn, requiring him to take and exhaust FMLA leave.

221.

Defendant rescinded Plaintiff's work from home arrangement and required him to take and exhaust FMLA leave within a close temporal proximity to Plaintiff's accommodation requests.

222.

Defendant's proffered reasons for rescinding Plaintiff's work from home arrangement and requiring him to take and exhaust FMLA leave are pretext for retaliation.

223.

Defendant's retaliatory actions against Plaintiff were in violation of the ADAAA.

224.

As a direct and proximate result of Defendant's unlawful actions and failures to act, Plaintiff has suffered compensatory damages including, emotional distress, mental anguish, physical harms, and other non-pecuniary losses, as well as economic damages, for which he is entitled to recover from Defendant.

225.

Defendant performed the above actions willfully, wantonly, intentionally, with malice and/or in reckless disregard of Plaintiff's federally-protected rights. Plaintiff is therefore entitled to punitive damages.

226.

All conditions precedent to bringing this Count have been completed, performed, and/or waived.

## <u>COUNT THREE: RETALIATION IN VIOLATION OF THE ADAAA</u>
## <u>(TERMINATION OF EMPLOYMENT)</u>

The allegations in the preceding paragraphs are incorporated by reference as if set forth herein.

### 227.

At all times relevant to this action, Plaintiff has been an individual with a disability as defined by the ADAAA.

### 228.

At all times relevant to this action, Defendant "regarded" Plaintiff as having a disability such that he is a person with a disability and/or perceived disability within the meaning of the ADAAA.

### 229.

Plaintiff engaged in protected activity by requesting an accommodation because of his actual or perceived disability.

### 230.

Defendant retaliated against Plaintiff by terminating Plaintiff's employment on the basis of his requests and need for accommodation.

231.

Defendant terminated Plaintiff's employment within a close temporal proximity to Plaintiff's accommodation requests.

232.

Defendant's proffered reasons for terminating Plaintiff's employment are pretext for retaliation.

233.

Defendant's retaliatory actions against Plaintiff were in violation of the ADAAA.

234.

As a direct and proximate result of Defendant's unlawful actions and failures to act, Plaintiff has suffered compensatory damages including, emotional distress, mental anguish, physical harms, and other non-pecuniary losses, as well as economic damages, for which he is entitled to recover from Defendant.

235.

Defendant performed the above actions willfully, wantonly, intentionally, with malice and/or in reckless disregard of Plaintiff's federally-protected rights. Plaintiff is therefore entitled to punitive damages.

236.

All conditions precedent to bringing this Count have been completed, performed, and/or waived.

## COUNT FOUR: DISABILITY DISCRIMINATION IN VIOLATION OF THE ADAAA

The allegations in the preceding paragraphs are incorporated by reference as if set forth herein.

237.

Defendant is an employer as defined by the ADAAA and was Plaintiff's employer as defined therein.

238.

At all times relevant to this action, Plaintiff was a "qualified individual" as that term is defined by the ADAAA.

239.

Plaintiff is a person with a disability within the meaning of the ADAAA, in that (A) he has a physical impairment that substantially limits one or more major life activities or the operation of a major bodily function; (B) has a record of such an impairment; and/or (C) was regarded by Defendant as having such an impairment.

240.

At all times relevant to this action, Defendant and individuals involved in the decision to terminate Plaintiff were aware of Plaintiff's actual disability, including at the time of Defendant's termination of Plaintiff's employment.

241.

At all times relevant to this action, Defendant and individuals involved in the decision to terminate Plaintiff regarded Plaintiff as having a disability within the meaning of the ADAAA.

242.

At all times relevant to this action, Defendant and individuals involved in the decision to terminate Plaintiff were aware of Plaintiff's record of a disability within the meaning of the ADAAA.

243.

Defendant terminated Plaintiff's employment because of his actual disability, perceived disability, and/or his record of such an impairment and his requests for accommodation.

244.

Plaintiff's disability and/or need for a reasonable accommodation were determinative factors in Defendant's decision to terminate Plaintiff's employment.

245.

Defendant discriminated against Plaintiff on the basis of his actual disability, perceived disability, or record of such an impairment as defined under the ADAAA by requiring Plaintiff to take a medical leave of absence, refusing to allow Plaintiff to continue working from home, denying Plaintiff's request to resume working from home, and requiring Plaintiff to obtain a full medical release clearing him to work in person without medical restrictions.

246.

Defendant further discriminated against Plaintiff on the basis of his actual disability, perceived disability, or record of such an impairment as defined under the ADAAA by terminating his employment.

247.

Defendant's proffered reasons for terminating Plaintiff's employment are pretext for discrimination.

248.

Defendant's discriminatory conduct towards Plaintiff was in violation of the ADAAA.

249.

As a direct and proximate result of Defendant's unlawful actions and failures to act, Plaintiff has suffered compensatory damages including, emotional distress, mental anguish, physical harms, and other non-pecuniary losses, as well as economic damages, for which he is entitled to recover from Defendant.

250.

Defendant performed the above actions willfully, wantonly, intentionally, with malice and/or in reckless disregard of Plaintiff's federally-protected rights. Plaintiff is therefore entitled to punitive damages.

251.

All conditions precedent to bringing this Count have been completed, performed, and/or waived.

## COUNT FIVE: FMLA INTERFERENCE

The allegations in the preceding paragraphs are incorporated by reference as if set forth herein.

252.

At all times relevant, Defendant has employed 50 or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year.

253.

Defendant is a covered employer and is subject to the provisions of the FMLA.

254.

At all times relevant to this action, Plaintiff had a serious health condition as defined under the FMLA and was eligible for FMLA leave.

255.

At all times relevant to this action, Defendant and its agents knew of Plaintiff's serious health condition. Moreover, the Defendant and its agents knew that Plaintiff's absences from work were due to his serious health condition. Defendant and its agents were also aware that Plaintiff applied for and was approved FMLA leave.

54

256.

During Plaintiff's approved FMLA leave period, Defendant and its agents interfered with Plaintiff's leave by incessantly contacting him about work matters and requiring him to perform work-related tasks.

257.

Plaintiff felt harassed by Defendant's conduct of contacting him about work matters and requiring him to perform work-related tasks while he was on FMLA leave.

258.

Defendant and its agents infringed upon Plaintiff's quiet enjoyment of his FMLA leave by contacting him and requiring him to work while he was on FMLA leave.

259.

At the end of his FMLA leave period, Plaintiff was entitled to return to his position or its equivalent.

260.

Defendant interfered with Plaintiff's FMLA rights by failing to reinstate Plaintiff to his position or its equivalent and instead, terminating his employment.

261.

Defendant's conduct, as alleged herein, was undertaken with deliberate indifference to Plaintiff's federally protected rights under the FMLA.

262.

As a direct and proximate result of Defendant's unlawful actions and failures to act, Plaintiff has suffered economic damages, for which he is entitled to recover from Defendant.

## COUNT SIX: FMLA RETALIATION

The allegations in the preceding paragraphs are incorporated by reference as if set forth herein.

263.

During the course of Plaintiff's approved FMLA leave, Defendant retaliated against Plaintiff for exercising his right to take FMLA leave, by incessantly contacting him while he was on approved FMLA leave, forcing him to perform work functions during his covered FMLA period, and ultimately, terminating his employment.

264.

Defendant's actions demonstrate violations of the FMLA's retaliation provision.

265.

The actions complained of in this action were done because of Plaintiff's exercise of his rights under the FMLA.

266.

The actions complained of this action were in close proximity to Plaintiff's protected activity as defined under the FMLA.

267.

Defendant knew or should have known that the means utilized to punish Plaintiff for using his FMLA leave were forbidden by law.

268.

Defendant's conduct, as alleged herein, was undertaken with deliberate indifference to Plaintiff's federally protected rights under the FMLA.

269.

As a direct and proximate result of Defendant's unlawful actions and failures to act, Plaintiff has suffered economic damages, for which he is entitled to recover from Defendant.

## COUNT SEVEN: RACE DISCRIMINATION
## IN VIOLATION OF TITLE VII & SECTION 1981
## (WAGE DISCRIMINATION)

The allegations in the preceding paragraphs are incorporated by reference as if set forth herein.

### 270.

At all times relevant to this action, Defendant has continuously been an employer engaged in an industry affecting commerce under Section 701(b), (g) and (h) of Title VII, 42 U.S.C. § 2000e(b), (g) and (h).

### 271.

Plaintiff is an African American and member of a protected class under Section 1981 and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et. seq.

### 272.

Defendant paid Plaintiff lower wages than similarly situated peers outside of Plaintiff's protected race.

### 273.

Plaintiff was qualified to receive a higher wage.

274.

Defendant knowingly and intentionally discriminated against Plaintiff on the basis of his race by paying him lower wages than similarly situated peers outside of his protected status.

275.

The reasons given by Defendant for the adverse employment action are pretextual and designed to hide Defendant's racially discriminatory motive.

276.

Defendant's actions constitute unlawful retaliation in violation of Title VII and Section 1981.

277.

Defendant performed the above actions willfully, wantonly, intentionally, with malice and/or in reckless disregard of Plaintiff's federally-protected rights.

278.

Plaintiff is entitled to an award of backpay and benefits, front pay, compensatory damages, punitive damages, attorney's fees, and all other appropriate damages, remedies, and other relief available under Title VII and Section 1981.

279.

All conditions precedent to bringing this Count have been completed, performed, and/or waived.

## COUNT EIGHT: RACE DISCRIMINATION IN VIOLATION OF TITLE VII & SECTION 1981 (NON-SELECTION)

The allegations in the preceding paragraphs are incorporated by reference as if set forth herein.

280.

Plaintiff is an African American and member of a protected class under Section 1981 and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et. seq.

281.

Defendant knowingly and intentionally discriminated against Plaintiff on the basis of his race by selecting a less qualified and less experienced candidate outside of Plaintiff's protected race to fill the Director of Strategic Programs position.

282.

The reasons given by Defendant for the adverse employment action are pretextual and designed to hide Defendant's racially discriminatory motive.

283.

Defendant's actions constitute unlawful discrimination in violation of Title VII and Section 1981.

284.

Defendant performed the above actions willfully, wantonly, intentionally, with malice and/or in reckless disregard of Plaintiff's federally-protected rights.

285.

Plaintiff is entitled to an award of backpay and benefits, front pay, compensatory damages, punitive damages, attorney's fees, and all other appropriate damages, remedies, and other relief available under Title VII and all federal statutes providing remedies for violations of Title VII.

286.

All conditions precedent to bringing this Count have been completed, performed, and/or waived.

## COUNT NINE: RETALIATION IN VIOLATION
## OF TITLE VII & SECTION 1981
## (NON-SELECTION)

The allegations in the preceding paragraphs are incorporated by reference as if set forth herein.

### 287.

Plaintiff engaged in protected activity when on February 28, 2020, he complained to Defendant that he felt he was required to prove himself, work twice as hard as his non-black peers, and compete for a job he was already performing because he is an African American male.

### 288.

As a result of his complaints of discriminatory personnel practices, Defendant retaliated against Plaintiff by not selecting Plaintiff to fill the Director of Strategic Programs position.

### 289.

Defendant's decision not to select Plaintiff for the Director of Strategic Programs position was in close proximity to Plaintiff's protected activity.

### 290.

In failing to select Plaintiff for the vacant position, Defendant knowingly and intentionally retaliated against Plaintiff for engaging in protected activity.

291.

The reasons given by Defendant for the adverse employment action are pretextual and designed to hide Defendant's retaliatory motive.

292.

Defendant's actions constitute unlawful retaliation in violation of Title VII and Section 1981.

293.

Defendant performed the above actions willfully, wantonly, intentionally, with malice and/or in reckless disregard of Plaintiff's federally-protected rights.

294.

Plaintiff is entitled to an award of backpay and benefits, front pay, compensatory damages, punitive damages, attorney's fees, and all other appropriate damages, remedies, and other relief available under Title VII and all federal statutes providing remedies for violations of Title VII.

295.

All conditions precedent to bringing this Count have been completed, performed, and/or waived.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this Court:

1.  Grant to Plaintiff a jury trial on all issues so triable;

2.  Grant declaratory judgment that Plaintiff's rights under the ADAAA, FMLA, Title VII, and Section 1981 have been violated;

3.  Grant Plaintiff a permanent injunction prohibiting Defendant from engaging in such unlawful conduct in the future;

4.  Award compensatory damages in an amount reasonable and commensurate with the economic losses that he has suffered as a result of Defendant's discrimination and retaliation and the pain, emotional distress, and physical harms imposed upon him by Defendant's intentionally discriminatory acts, in an amount reasonable and commensurate with the harm done and calculated to be a sufficient deterrent to such conduct in the future, and all other sums and relief to which Plaintiff is entitled under the law;

5.  Award appropriate back pay, reinstatement or front pay in lieu of reinstatement, reimbursement for lost salary, and compensation for other damages suffered by Plaintiff by reason of Defendant's violations of the ADAAA, FMLA, Title VII and Section 1981, in an amount to be shown at trial;

6.  Award liquidated damages under the FMLA, in the amount of any wages, salary, employment benefits, or other compensation denied or lost to Plaintiff by reason of Defendant's violation of the FMLA and interest on the amount described above calculated at the prevailing rate;

7.  Award pre-judgment and post-judgment interest calculated at the prevailing rate;

8.  Award nominal damages;

9.  Award punitive damages in an amount reasonable and commensurate with the harm done and calculated to be sufficient to deter such conduct in the future;

10. Award Plaintiff's attorneys' fees, costs, and other expenses of litigation, including but not limited to reasonable expert witness fees and other costs of the action; and

11. Award Plaintiff such additional relief as the Court deems proper and just.

This 24th day of January, 2021.

SHELTON LAW PRACTICE, LLC

By:   /s/    Cherri L. Shelton
        Georgia Bar No. 27693

Shelton Law Practice, LLC
400 Galleria Parkwy, Suite 1500
Atlanta, GA 30339
Phone: (404) 865-3771
Facsimile: (678) 882-7499
cshelton@sheltonlawpractice.com

**ATTORNEY FOR PLAINTIFF**